## M. E. Wilson v. The State.

### No. 7153.   Decided March 21, 1923.

#### Rehearing Denied May 16, 1923.

**1.—Robbery—Corroboration—Accomplice—Insufficiency of the Evidence.**

Where, upon trial of robbery, the evidence of corroboration of the accomplice was insufficient to sustain the conviction, and consisted chiefly of the corroboration of one accomplice by another, the judgment must be reversed and the cause remanded. Following Woodall v. State, 58 Texas Crim. Rep., 513.

**2.—Rehearing—Accomplice—Corroboration—Insufficient.**

Where the State in its motion for rehearing insisted that the accomplice's testimony was sufficiently corroborated, this court has again reviewed the record but must adhere to its conclusion, that the evidence is insufficient to sustain the conviction.

Appeal from the District Court of Stephen. Tried below before the Honorable C. O. Hamlin.

Appeal from a conviction of robbery; penalty, twenty years imprisonment in the penitentiary.

The opinion states the case.

*E. D. Gatlin* and *Robert Price,* for the appellant.—On question of insufficiency of corroboration, Boone v. State, 235 S. W. Rep. 581; Meedham v. State, 233 id., 966; Pate v. State, 239 id., 967; Hucaby v. State, 240 id., 567; Forward v. State, 166 id., 725; Johnson v. State 236 id. 101; Spenser v. State, 106 id., 386.

*R. G. Storey,* Assistant Attorney General, and *S. J. Osborne,* Asst. Dist. Attorney, for the State.

HAWKINS, JUDGE.—Appellant was convicted upon a charge of robbing J. C. Brown, his punishment being assessed at twenty years confinement in the penitentiary.

There are no bills of exception in the record. The only question presented for review is that the evidence is insufficient to sustain the conviction, in .that the testimony of the accomplice witness, Cliff Morton, is not corroborated to the extent required by Article 801, Code Criminal Procedure.. It being necessary in determining this question to consider the testimony of the other witnesses and see if by itself that tends to connect appellant with the commission of the offense charged, we will first give a condensed statement of their evidence before relating the testimony of the accomplice. Welden v. State, 10 Tex. Crim Rep., 400; Boone v. State, 90 Texas Crim. Rep., 374, 235 S. W. Rep., 580.

The evidence establishes that a robbery occurred on the night of April 25th. J. C. Brown was an employe of the Texas Pipe Line Company. On this night he, with a number of the other employes, were in what is called a "bunk house" engaged in a game of poker. It had been raining during the afternoon and was still raining at the time the robbery occurred, which was some time in the early part of the night. Quite a number of the parties who were present at the time of the robbery were used as witnesses. All of their testimony was in substance, that two parties came into the bunk house having handkerchiefs or white masks of some kind over their faces, and with pistols in their hands demanded the money of the parties present. One man, as soon as he realized that a robbery was imminent, ran out the back door of the "bunk house" and gave the alarm. All agree that this caused the two men to hurry in their operations and they were only in the "bunk house" from a half minute to a minute and a half. None of the parties present at the robbery undertake to identify either appellant or Morton as the parties engaged in the hold-up. They do testify that in size, general appearance and manner of dress, they corresponded in a.general way with the two men who committed the robbery. They all seem to be in accord that both robbers had on caps; that one of them had on a khaki shirt and trousers and puttees. Brown, the party who was alleged to have been robbed in the instant case, was acquainted with appellant Wilson, and had known him for quite a while. He does not claim to have recognized appellant as one of the robbers. One of the parties robbed testified on direct examination that to the best of his belief and knowledge appellant was one of the parties "that came in there that night and did the hi-jacking. I recognize him just from his general build and everything. He was dressed that night very much the same as .he is now, puttees, khaki pants and was about that size and build. * * * He was wide across the shoulders but came in slightly stooped, both of them were, and after he came in I had a chance to look him over and from his general build that is the man."

However, on cross-examination this witness modified his testimony to the extent of saying that "About all I could tell the jury is that this man (appellant) had a general resemblance to the one that robbed me. He was a man of about the same size and had light hair."

Mrs. Stokes and her husband were the proprietors of a rooming house known as the "Temple Rooms." Appellant occupied room number nine at their house on the night of the alleged robbery. Mrs. Stokes says that on the night before, April 24, he had registered there under the name of Joe Spris; that when she assigned him a room on the night of April 25th she did not ask him to register again, but herself wrote that name on the register, following the name as written by him the night before. They did not know appellant by the name of Wilson. They claim appellant came into the rooming house on the night of the robbery some time between eleven and twelve o'clock; that his clothing was wet, and Mrs. Stokes suggested that she would get a gas stove for him on that account. He thanked her and said he would be glad to have it if it would not be too much trouble. Appellant was arrested on the next night at the same rooming house; some of his clothing was still wet, and clothing similar to that described by the witnesses who were robbed as having been worn by one of the robbers was found in his room and which he wore at the trial. It would be well to observe here that of the many witnesses used none of them undertake to identify any particular article of clothing found in appellant's possession or which he was wearing at the time of the trial as being the same as that worn by one of the robbers, but the nearest they come is only that in a general way the clothing corresponded. J. T. Coleman testified substantially that he had known appellant for about four months and had slept with him at the Temple Rooms on three or four nights; that on the night of the alleged robbery witness came in about eleven o'clock and when he went to Wilson's room found him in bed with a gas stove burning and some clothes around it drying. He testified that earlier in the evening, about eight o'clock, he saw one Ernest DeBeauford at a store; that when he came in appellant was already there; that if DeBeauford and appellant were acquainted prior to this time he had no knowledge of it, and that he introduced them; that he saw appellant and De-Beauford talking, but heard none of their conversation and that the two went away from the store together; that he saw no more of Wilson until he went to his room later that night, but that De-Beauford had told witness that Wilson said he would be at the Temple Rooms and for him (witness) to come there and sleep. Witness was not acquainted with Cliff Morton, and did not see him at the store nor with DeBeauford or appellant. It was raining at the time DeBeauford and Wilson left the store, and this witness seems to have remained there until after the rain when he went to the rooming house where he found Wilson already there. All of the

witnesses agree that it was raining on the night of the robbery and we do not see that any particular significance can be attached to the fact that appellant's clothing was wet when he came into the rooming house, for the same result would have occurred regardless of where he may have been if he had been exposed to the weather. Up to this point it is apparent we believe from our statement of the evidence that there is no testimony sufficiently definite to identify appellant as one of the parties who committed the robbery.

Cliff Morton, the accomplice, testified to a rather singular state of affairs. His first statement on direct examination is as follows:

"I don't know the defendant M. E. Wilson for sure. I don't know him personally. I know Ernest DeBeauford. I reckon he is the man that was with me when we held up the boys out at the Texas Camp. I don't know. We left town that night between eight and nine from the Cozy Rooming house. I had been staying there with Ernest De-Beauford. We were rooming together."

Later this witness, referring to appellant as being the party who was with him on the night in question, claims that DeBeauford came to the room where witness was and told him there was a party down at the drug store who wanted him (witness) to go with him and "hi-jack" some parties; that witness took his own gun and that DeBeauford loaned the other man one; that he went with DeBeauford to where the latter pointed out appellant in front of the drug store; that he and appellant then went to the "bunk house" where Brown and the others were gambling and "held up" the game; that it was raining and both of them got wet; that appellant asked witness to go in first as there might be some parties in there who were acquainted with him and said he thought he knew some of them; that after the robbery they came back to witness's room where he and appellant divided the money between them; that DeBeauford was not present when this was done; that witness the next morning hid the pistols up in the ceiling. Upon being asked by a juror if appellant was the man who went with him and "hi-jacked" the game that night Morton's reply was, "I will answer that he looks like the man." Upon further examination by the district attorney on the same subject he said,

"The defendant looks like the man that was with me that night but I would not be sure he was the man because I never knew him before in my life until that night. You ask me for my judgment and I answer he looks like the man."

Every time the direct question was put to the witness Morton the foregoing statements are as positive as he would ever be as to whether appellant was the man who was with him at the time the robbery occurred. Morton says that upon the night of the robbery he had on a pair of blue serge pants and did not have on puttees, but that the man who was with him had on puttees or a pair of leggins.

The sheriff testified that on the next morning after the robbery was reported he found the two pistols, one of which was identified as belonging to DeBeauford and the other as belonging to Morton, in the ceiling where Morton claims to have hid them. It must be borne in mind that these pistols were not found in the room of appellant nor in the room where he had been staying, but in the room of De-Beauford. A large part of the sheriff's testimony was hearsay and would have been inadmissible if objection had been made thereto, but no bills of exception appearing in the record, we are unable to say whether this testimony went in without objection. The sheriff testifies substantially, that he talked to the parties who had been held up; that they seemed to have their minds pretty well made up that they could identify the men who robbed them; that he had one of them go back to town with him, where he pointed out DeBeauford. The sheriff then followed DeBeauford down the street a short distance where the latter sat down on a bench by the side of a party who later developed to be Morton. After making to DeBeauford and Morton the officer made the search which resulted in discovering the pistols in the ceiling of DeBeauford's room. The sheriff again talked to Morton who then acknowledged that he was connected with the robbery. It appears that DeBeauford and Morton at this time were either in jail or being held by the officers. If appellant had been even suspected up to this point the record does not disclose it. The sheriff says they had not put DeBeauford and Morton together, and that one of his deputies told DeBeauford that Morton was mixing him and some other party up in it, whereupon DeBeauford said if they were going to do that he would tell all he knew about it, and then told the sheriff he (DeBeauford) let appellant have his pistol and knew that Morton and appellant were going to the camp to "hold up" the game, but that he (DeBeauford) had nothing further to do with it than loan appellant his gun. It was upon the information of DeBeauford as to where appellant could be found that his arrest followed.

Appellant denied that he knew Morton at all; testified that he met DeBeauford the night of the robbery; that he was with him a while during the early part of the night, and then went to his room; that he had nothing to do with the robbery. He also denied having registered for his room under another name.

The foregoing statement of the evidence renders it unnecessary to discuss the legal proposition at any great length. According to the sheriff's account of DeBeauford's admissions the latter was himself an accomplice. He furnished the pistol with which appellant was armed at the time of the robbery, if he is to be believed, knowing that the robbery was contemplated; and according to Morton's testimony, brought him and appellant together. If DeBeauford had been called as a witness in person, being an accomplice, he could not have cor-

roborated Morton. It is so well settled that one accomplice can not corroborate another, that we cite only Section 718, Branch's Ann. Penal Code, and the cases there collated. If the state had labored under this disadvantage in the face of the personal testimony of De-Beauford, we are not able to perceive by what process of reasoning its condition was improved by his hearsay statements put in evidence through the sheriff. We understand from the record that one of the victims of the robbery pointed DeBeauford out as one of the robbers Two pistols, one DeBeauford's, the other belonging to Morton, where found where Morton had secreted them in the former's room, and which were used in the robbery, if Morton's evidence is to be believed. This appellant may be guilty, but there is no sufficient evidence tending to connect him with the commission of the robbery outside the tainted testimony of Morton and the hearsay statement of DeBeauford subject to the same defect. The statute precludes infringing upon the life or liberty of a citizen under such circumstances. Woodall v. State, 58 Tex. Cr. Rep., 513.

The judgment must be reversed for the reason stated, and the cause remanded.

*Reversed and remanded.*

ON REHEARING.

May 16, 1923.

MORROW, PRESIDING JUDGE.—In a very earnest motion, the State, through her district attorney, insists that this court was in error in reversing the judgment.

He refers to certain testimony which is not quoted in the opinion. While it was not practicable to quote the evidence referred to, it was considered upon the original hearing, and in the light of the motion, the record has been reviewed. We are of the opinion that the conclusion reached upon the original hearing properly disposed of the case.

The motion for rehearing is therefore overruled.

*Overruled.*